## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAHEEN NAMVARY, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CARTER'S, INC., and DOES 1-50, inclusive,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Shaheen Namvary ("Plaintiff") brings this action, on behalf of himself and all others similarly situated, against Defendant Carter's, Inc. ("Carter's" or "Defendant"), and states:

## I.       NATURE OF ACTION

1.       "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous California Supreme Court. This putative class action is about holding a multimillion-dollar company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for its merchandise through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin, *et al*., *Competition and the Regulation of Fictitious Pricing*, 87 J. MKTG. 826, 835 (2023) ("Staelin").

2.      Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendant lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.[2]

3.      At all relevant times, Defendant has continually advertised false price discounts for merchandise sold throughout its stores and on its website, carters.com. In bringing this putative class action complaint, Plaintiff seeks to remedy this deception and its attendant harm to consumers. Plaintiff seeks damages, restitution, and declaratory and injunctive relief from Defendant arising from its false discounting scheme on its infant and children's apparel and other items sold in its brick and mortar stores and e-commerce website, carters.com.

4.      False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (1992) ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. Retailing 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

[2] Staelin, 87 J. Mktg. at 834 (retail firms "can increase their profits and consumers pay higher prices when firms engage in fictitious pricing practices"); *id.* at 835 ("a firm's financial gains from posting inflated reference prices are likely taken out of the consumer's pocket.").

artificially inflates the market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[3] Consequently, false reference pricing schemes enable retailers, like Defendant, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.    The following example of a hypothetical DVD seller, which parallels Defendant's practice, illustrates how false reference pricing schemes harm consumers: the DVD seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly offer the DVD and make a profit. Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchasing the DVD for $10.00 assume they got a "good deal" since the DVD was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

6.    The consumer's presumption and purchase stem directly from the seller's deception. For example, if the seller tried to sell that same DVD for $10.00 **_without_** referencing a false original price of $100.00, and the attendant 90% off discount, that seller would not be able to sell many, if any, DVDs at $10.00 because the true market value of the DVD is $5.00. In contrast, by presenting consumers with a false "original" price of $100.00, consumers _will_ purchase the DVD at $10.00. By doing so, the seller has fabricated an artificial and illegitimate

---

[3] Dhruv Grewal & Larry D. Compeau, _Comparative Price Advertising: Informative or Deceptive?_, 11 J. PUB. POL'Y & MKTG. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

increase in consumer demand for the DVD through the reasonable, but incorrect, ***perceived value*** of the DVD in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased willingness to pay $10.00 for the DVD, based on the false discount, in turn creates a new, albeit artificial and illegitimate, market price of the DVD. The seller can therefore create an artificially inflated market price for the DVD of $10.00 by advertising the false "original" price and corresponding fake discount.

7.      Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendant violated, and continues to violate, New York and federal law. Specifically, Defendant violates and continues to violate: New York Consumer Protection from Deceptive Acts and Practices Act, N.Y. GBL § 349, *et seq.* (the "NYDAPA"), New York False Advertising Act, N.Y. GBL § 350, *et seq.* (the "NYFAA"), as well as the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

8.      Plaintiff brings this action on behalf of himself and other similarly situated consumers who have purchased one or more of Defendant's items advertised at a purported discount from a fictitious higher reference price from a Carter's store and/or its website, carters.com. Plaintiff intends to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to permanently enjoin Defendant from engaging in this unlawful conduct. Further, Plaintiff seeks to obtain all applicable damages, restitution, reasonable costs and attorney's fees, and other appropriate relief in the amount by which Defendant was unjustly enriched as a result of its sales of merchandise offered at a false discount.

## II.    JURISDICTION AND VENUE

9.    This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and Plaintiff, and at least some members of the proposed Class (defined below), have a different state citizenship from Defendant.

10.    The Southern District of New York has personal jurisdiction over Defendant because Defendant conducts sufficient business with sufficient minimum contacts in this District, and/or otherwise intentionally avails itself of the New York market through the operation of Carter's stores within the State of New York, and because it regularly sells merchandise on its website to New York citizens.

11.    Venue is proper under 28 U.S.C. § 1391(b)(1) because Plaintiff resides in and is a citizen of this District, as well as under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and Defendant's misconduct alleged herein occurred in this District.

## III.    GENERAL ALLEGATIONS

### A.    Retailers Benefit from False Reference Pricing Schemes.

12.    Defendant engages in a false and misleading reference price scheme in the marketing and selling of its merchandise at its Carter's retail stores and e-commerce website, carters.com.

13.    As mentioned above, retailers like Defendant benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get **higher margins**, but also **increase sales**." Staelin, *et al*., *supra*, at 835 (emphasis added). This is because consumers use advertised reference prices to make purchase decisions, particularly

when the information available to consumers can vary among different types of products.[4] Most often, as with retail clothing, consumers lack full information about the products and, as a result, often use information from sellers to make purchase decisions.[5]

14.    Defendant's deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[6] In other words, consumers view Defendant's deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[7] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[8] Under this concept, coined as "transaction utility" by Noble Prize-winning

---

[4] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby, & Edi Karni. *Free Competition and the Optimal Amount of Fraud*, J. LAW & ECONOMICS 16 no. 1 (1973): 67-88, at 68-69.

[5] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. J. POLITICAL ECONOMY 78, no. 2 (1970): 311-29, at 311-12.

[6] Dhruv Grewal & Larry D. Compeau. *Comparative Price Advertising: Informative or Deceptive?*, J.PUBLIC POLICY & MARKETING (1992): 52-62, at 54; *see also* Richard Thaler. *Mental Accounting and Consumer Choice*. MARKETING SCIENCE 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[7] Dhruv Grewal, & Larry D. Compeau. *Comparative Price Advertising: Informative or Deceptive?,* J. OF PUBLIC POLICY & MARKETING (1992): 52-62, at 52.

[8] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain*. J. OF CONSUMER PSYCHOLOGY 13, no 3 (2003): 328-38, at 328.

economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[9]

15.    Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[10] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[11] Researchers report that consumer's internal reference prices adjust toward external reference prices when valuing a product.[12] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[13] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher

---

[9] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'" Richard Thaler. *Mental Accounting and Consumer Choice*. MKTG SCI. 4, no. 3 (1985): 199-214, at 205.

[10] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, J. OF CONSUMER RESEARCH 19, no. 1 (1992): 62-70, at 68.

[11] Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*. J. CONSUMER RESEARCH 19, no. 1 (1992): 62-70, at 62.

[12] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal, Kent B. Monroe & Ramayya Krishnan. *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions.* J. OF MARKETING 62 (1998): 46-59, at 48.

[13] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler. *Mental Accounting and Consumer Choice*. MKTG SCI. 4, no. 3 (1985): 199-214, at 212.

for buyers with less experience or knowledge of the product and product category."[14] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[15] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products ... Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][16]

16.     In Staelin, *Regulation of Fictitious Pricing*, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, recently built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and confirms many of the same older consumer studies cited above[17] and notes that the findings of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

---

[14] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*. J.PUBLIC POLICY & MARKETING 18, no. 1 (1999): 3-10, at 7.

[15] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research*. MARKETING SCIENCE 14, no. 3 (1995): G161-G169, at G161; *see also* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. J. OF APPLIED BUS. RESEARCH 6, no. 1 (1990): 59-69, at 65-66. ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[16] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*. J.PUBLIC POLICY & MARKETING 18, no. 1 (1999): 3-10, at 7.

[17] *See* Staelin, *Regulation of Fictitious Pricing* (manuscript at 3) ("It is now well established that many consumers get extra utility beyond that associated with consuming the product from

17.    Additionally, Staelin, *Regulation of Fictitious Pricing*, explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones, online shopping) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[18] According to Staelin and his co-authors, "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 826. *See also id.* at 831 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.    Consequently, retailers like Defendant, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendant's advertisements, consumers are not receiving *any* discount and are actually *overpaying* for Defendant's product because, as Staelin, *et al*. put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, ***with fake discounts having a substantially larger effect than real discounts***.") *Id.* at 835 (emphasis added).

**B.    Defendant Engages in a Fraudulent Price Discounting Scheme.**

19.    For years, Defendant has engaged in a fake discounting scheme that harms consumers by advertising apparel, accessories, and other items at purportedly discounted "sale" prices in its retail stores and website, carters.com. In short, Defendant attaches price tags ("ticket prices") to its merchandise intended to represent the "original" former price at which Defendant sold its products both in its brick-and-mortar stores and on its website, carters.com. Although the

---

purchasing it on deal (<u>Thaler 1985, Compeau & Grewal 1998, Krishna et al. 2002</u>) and that magnitude of this utility is a function of the size of the deal.") (emphasis added).

[18] Staelin, *et al*., *supra*, at 826. (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

ticket prices use the term "MSRP" next to the price, they also include a self-described "Date of Birth" ("DOB") that Defendant claims was the date that it supposedly began offering the product at its full ticket price. The ticket prices also reference the website, carters.com, thus giving the impression that the same merchandise is available for the same price on Defendant's website.

20.    In its stores, Defendant aggressively markets deep discounts from the advertised ticket prices primarily through placard signage resting on or attached to the product rack or shelf where the merchandise is located. The signs are printed in an eye-popping red or blue-and-white color scheme, boldly emphasizing a deep discount framed as "___% Off" the associated ticket price(s).[19]

21.    The photos below show representative examples of Defendant's storewide practice of advertising discounts in its brick and mortar stores.[20]



---

[19] The advertised discounts typically range between 40% to 60% off the ticket price.

[20] *See* **Exhibit A**, additional Carter's in-store photographs depicting the extent and prevalence of discount signage throughout the store.

 

22.     Similarly, on its website, carters.com, Defendant advertises the same discounts sitewide by placing a line through the ticket price (a "strikethrough"), as well as a representation of the purported "% off" (e.g., 50% off) next to the purportedly discounted price that is displayed in large, bold text: [21]

---

[21] Attached hereto as **Exhibit B** are numerous snapshots from carters.com depicting falsely discounted merchandise. Attached as **Exhibit C** are numerous snapshots of the website acquired from the Wayback Machine ("WBM"). WBM (accessible at https://wayback-api.archive.org/) is a well-regarded internet archive of websites and webpages as they existed at one point in time. In other words, while a website may update its content periodically, WBM permits users to view it exactly as it appears on the date the page snapshot is taken. The date of the snapshot is shown at the top of each page.







23.     Most products offered on the website also have a small information tab which, if clicked, leads to a purported "Disclaimer" that states:

> DOB [mo/year]
>
> Many of our collections have a DOB (Date of Birth) on the price tag or on their website product page. This is the date that this item or a similar item was originally offered for sale at the MSRP.
>
> MSRP is our Manufacturer's Suggested Retail Price at which we suggest our collections be initially offered. We list an MSRP on our products that we sell ourselves and that sell through our wholesale partners. Our wholesale partners are free to use our MSRP or set a different selling price, actual sales may or may not have been made at MSRP in any certain area or in all areas. Prices may vary by channel or location.[22]

24.     Thus, Defendant states in no uncertain terms that the exact same (or similar) item **"was originally offered for sale at [the ticket price]"** on the Date of Birth. In other words,

---

[22] Carter's sells certain product lines through certain wholesale partners, such as JCPenney and Target, but according to Carter's Form 10-k filed with the Securities and Exchange Commission, it appears that those products are "exclusive" branded merchandise made exclusively for the wholesalers, meaning they are not the exact same products sold in Carter's stores or on its website. In other words, based on the Form 10-k, Plaintiff alleges that the products available at Carter's stores and on its website are *only* offered and available for purchase through those two channels, and not through Carter's wholesale partners.

Defendant affirmatively represents that its ticket prices are not just "suggested" prices, but rather, they are **actual, bona fide <u>former</u>** prices at which Defendant allegedly offered the product for sale in the recent past.

25.    The products sold at Defendant's brick and mortar stores are the same products offered on the carters.com website.

26.    In reality, at both the brick-and-mortar Carter's stores and on the carters.com website, the products are hardly, if ever, offered for sale, let alone actually sold, at the stated ticket prices. Instead, those prices are used solely to induce consumers to make purchases and spend money under the reasonable, but incorrect, belief that the merchandise was previously offered and sold at the reference price for a reasonably substantial period of time.

27.    Thus, even if Defendant did previously offer its merchandise at the full ticket price for some short period of time (something Defendant rarely, if ever, does), that limited offering would do little to legitimize Defendant's practice. This is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be a price at which Defendant sold or offered to sell its merchandise "**on a regular basis for a reasonably substantial period of time**." 16 C.F.R. § 233.1(a) (emphasis added).

28.    The "MSRP" qualifier accompanying Defendant's in-store reference prices on its exclusive (and any fractional non-exclusive) items, is not a comparison to another market, such as with "compare at" qualifiers. To the extent Defendant's advertised discounts can be characterized as "suggested retail prices," or "MSRPs," Defendant's advertised reference price and discounting scheme also violates 16 C.F.R. § 233.3, which pertains to "advertis[ements] [of] retail prices which have been established or suggested by manufacturers." This is because 16 C.F.R. § 233.3(a) provides that "[t]o the extent that list or suggested retail prices do not in fact correspond to prices

at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer." (emphasis added). Here, the items sold in Defendant's Carter's retail stores and carters.com are rarely, if ever, sold there, or anywhere, at the "list or suggested retail prices"—and certainly not at a "substantial number of sales." Moreover, as the manufacturer and exclusive retailer of most, if not all, of the Carter's' retail merchandise, Defendant knows, or certainly should know, that substantial sales at these reference prices are not occurring. *See* 16 C.F.R. § 233.3(d) ("[I]f the list price is significantly in excess of the highest price at which substantial sales in the trade area are made, there is a clear and serious danger of the consumer being misled by an advertised reduction from this price."). At the very least, the resolution of these issues raises a reasonable question of fact.

29.    In sum, Defendant's fake discount scheme does not comply with the law and is intended to increase sales while depriving consumers of the benefit of their bargain.[23] Indeed, this conduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information. Nowhere in Defendant's stores or on its website does Defendant disclose that its ticket prices are **not**: (1) actual, bona fide former prices; (2) recent, regularly offered former prices; or (3) prices at which identical (or even substantially similar) products are regularly sold in the market. Nor does Defendant disclose the dates on which its ticket prices last prevailed in the market.[24] The omission of these material disclosures, coupled with

---

[23] Staelin *et al.*, *supra*, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product, from purchasing it on deal [] and that the magnitude of this utility is a function of the size of the deal.").

[24] To the extent Defendant contends that its "DOB" dates on its in-store price tags somehow bring it into compliance with the law, this argument fails for at least two additional reasons. First, the term "DOB" is meaningless to consumers who do not search Defendant's website, but "it is unrealistic for Defendant[] to expect consumers to pull out their smart phones and search the retailer's website for a definition [while they are shopping.]" *Chester v. TJX Companies, Inc.*,

Defendant's use of fake reference and sale prices renders Defendant's pricing scheme inherently misleading to reasonable consumers, like Plaintiff, who have no way meaningful way of discerning that Defendant's pricing representations are illegal without substantial, time-consuming, and costly investigation before *every* purchase.

### C.    Defendant's Fraudulent Price Discounting Scheme Harms All Consumers.

30.    A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[25] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[26] Consumers are misled and incorrectly overvalue Defendant's products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendant to command inflated prices for them beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from *false* reference prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be

---

No. 515CV01437ODWDTB, 2016 WL 4414768, at *11 (C.D. Cal. Aug. 18, 2016). Second, the already-vague "DOB" term provides only a month and year, and not a precise date or range of dates.

[25] Richard Thaler, *Mental Accounting and Consumer Choice*, MKTG SCIENCE 4, no. 3 (1985): 199-214, at 212.

[26] Jerry B. Gotlieb & Cyndy T. Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. J. OF APPLIED BUS. RESEARCH 6, no. 1 (1990): 59-69, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[27]

31.     Accordingly, all consumers who purchase Defendant's merchandise are harmed by Defendant's pricing scheme because its impact pervades the entire market for Defendant's merchandise. This is because the artificially increased demand generated by Defendant's pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false reference pricing scheme. Specifically, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin, *et al*., *supra*, at 835.[28]  Thus, all consumers who purchase products from Defendant pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendant's merchandise. Rather, all consumers who purchase falsely discounted products have overpaid and are deprived the benefit of their bargain (i.e., the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual sales price.

---

[27]Dhruv Grewal, Kent B. Monroe & Ramayya Krishnan, *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions*, J. OF MKTG 62 (1998): 46-59, at 46.

[28] *See also* Thaler, Richard. *Mental Accounting and Consumer Choice*. MKTG SCI. 4, no. 3 (1985): 199-214, at 205 ("To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'."); Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); Dhruv Grewal, & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*. J. PUB. POL'Y & MKTG 18, no. 1 (1999): 3-10, at 7.

32.     Fundamental economics concepts and principles dictate that the harm caused by Defendant's scheme is uniformly suffered by all shoppers alike. One such principle is that cost and demand conditions determine the market prices paid by all consumers.[29] The aggregate demand curve for a product, including Defendant's products, represents consumers' valuation of that product as whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness to pay a certain price for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

33.     As a result, Defendant's pricing scheme necessarily impacts the market prices of its products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in prices. Economic theory ensures that as the aggregate demand curve for the products moves outward, all consumers are forced to pay a higher price than the products would command absent the fake discounting scheme. Plaintiff and proposed Class members thus suffered a common impact from Defendant's misconduct.

**D.     Investigation**

34.     Plaintiff's counsel has conducted a large-scale, comprehensive investigation into Defendant's fake discounting scheme at its Carter's stores and online at carters.com. Plaintiff's counsel tracked items at carters.com independently from approximately May 24 to September 1, 2023, on a daily or near-daily basis. Indeed, everything offered on carters.com appears to be

---

[29] Mankiw, N. *Essentials of Economics.* 8th Edition. Boston, MA: Cengage Learning, 2015, at 66 ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also,* Hal R. Varian, *Microeconomics Analysis.* 3rd Edition. New York, NY: W. W. Norton & Company, 1992, at 23-38, 144-57, 233-353 & 285-312.

always, if not virtually always, advertised at discounts from higher reference prices. This confirmed allegations in Section III.B. above—that items for sale on carters.com are perpetually and uniformly priced with substantially "discounted" sale prices appearing next to both the "crossed out" (or "strikethrough") "original" price, next to the lower "sale" price. Attached hereto as **Exhibit D** is a summary of product tracking data collected by Plaintiff's counsel during 2023.

35.     Plaintiff's counsel also retained and deployed a preeminent computer programmer and non-testifying consulting expert to construct a data collection software application that monitored, ***on a daily basis***, Defendant's pricing practices for every product offered for sale from at least May of 2023 through February 2024 on carters.com. The process used to obtain the original and sale price for products on carters.com leveraged an open-source software library which is used for software test automation.  Plaintiff's counsel's consultant developed a proprietary application utilizing the library that initiated a web browser, loaded the URL (carters.com), then inspected the content of the page, isolating each of the links to the product.  The application crawled through each link, loading the pages one at a time and ultimately spanning the entire website. The application was designed to mimic what a search engine like Google does when it indexes a website. Once it loaded each page, the application sought out each of the products that were on sale. When it identified a product on sale, the application would record all the information about that product—e.g., price, sale, date, URL—and take a screenshot of the product. The application would also take a screenshot of the entire webpage, top to bottom, for verification that the data was not made up or tampered with in any way. This application was run twice a day, every day, on three different servers in different geographic locations around the country. This data was later aggregated into a single database where a timeline of the sale price for each product could be established. This data collection conclusively demonstrates Defendant's products at carters.com

are—just like its brick-and-mortar retail store products—constantly discounted on a rolling basis *See generally* **Exhibit E**, a sample of items identified as being discounted at the same reference and sale price for at least 95 days in a row.

36.    Plaintiff's counsel has also tracked Carter's physical store locations in California from April 18, 2024 through the present, and in Oregon from March 13, 2024 through the present. Plaintiff's counsel has also monitored Defendant's pricing in New York. Notably, on all observed occasions, all products observed remained "discounted" under the same, uniform pricing scheme[30] at all locations regardless of the state and year. The only thing that changed was the advertised discount and/or reference price on certain merchandise. In other words, all items had price tags that were constantly "discounted" by in-store signage indicating a substantial percent off ("__% Off") or whole-price reduction discount.

37.    Thus, the investigation confirms that the "original" or "price tag" reference price of the items Plaintiff purchased were never the actual selling prices of those items because they were never offered at those prices, but rather, consistent with Defendant's uniform scheme, continuously offered for sale at fake discount prices. The investigation confirmed that this was a pervasive, uniform, and systematic practice at Defendant's Carter's stores throughout the country and online at carters.com, as thousands of items remained continuously discounted throughout the investigation period. Indeed, the investigation indicated that Carter's merchandise is never offered for sale at its full "original" price—and certainly not "on a regular basis for a reasonably substantial period of time," as required by the FCTA. *See* 16 C.F.R. § 233.1 ("[T]he former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably

_____

[30] That is, the fake discounting scheme described above in Section III.B. has appeared uniformly implemented at each location. *See* **Ex. A**. Plaintiff is therefore informed and believes, and thereon alleges, that all Carter's pricing decisions are being made from the same source and applied uniformly across the country.

substantial period of time"); 16 C.F.R. § 233.3 ("To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.").

38.    Plaintiff's counsel also researched carters.com with the WBM.[31] The website snapshots recorded by the WBM are consistent with the investigation. *See* **Ex. C.**

39.    Thus, the false discounting scheme used by Defendant on its Carter's branded merchandise is uniformly and identically applied on all, or virtually all, of the Carter's products sold through Defendant's brick-and-mortar stores and e-commerce website, carters.com.

40.    Despite Plaintiff's counsel's best efforts at investigation, the full extent of Defendant's false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in Defendant's possession.

## IV.    PARTIES

**Plaintiff Shaheen Namvary**

41.    Plaintiff Shaheen Namvary resides in, and is a citizen of, New York, New York. Plaintiff has purchased many items from Defendant's stores in the past, including on April 16, 2023, when he shopped for clothing at the Carter's Manhattan-Harlem store located at 214 West 125th Street, Manhattan, NY 10027. In reliance on Defendant's false and deceptive advertising, marketing and discount pricing scheme, Plaintiff purchased the following items:

---

[31] "Courts have taken judicial notice of the contents of web pages available through the WBM as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Erickson v. Nebraska Machinery Co.*, No. 15-cv-01147-JD, 2015 WL 4089849, at *1 n.1 (N.D. Cal. July 6, 2015); *see also Pond Guy, Inc. v. Aquascape Designs, Inc.*, No. 13-13229, 2014 WL 2863871, at *4 (E.D. Mich. June 24, 2014) (same).

| No. | Item: | "Original" Price: | Purported Discount: | Purchase Price: |
|---|---|---|---|---|
| 1 | Baby Layette (SKU 195861169222) | $30.00 | 40% Off | $18.00 |
| 2 | Baby Layette (SKU 195861172031) | $30.00 | 40% Off | $18.00 |
| 3 | Acces Socks: (SKU 195861606185) | $37.50 | 40% Off | $22.50 |

42.     During his time at the Carter's store on April 16, 2023, Plaintiff browsed several items before deciding on what items to purchase. After reviewing the advertised sale prices for the items listed above, Plaintiff decided to purchase the above listed items.

43.     Indeed, after observing the original ticket prices of the items and the accompanying "% Off" advertisements and sale prices, Plaintiff believed he was receiving a significant discount on the items he had chosen. His belief that the discounted prices on the items was limited and would not last was material and integral to his purchase decision, and he would not have made the purchases were it not for the significant bargain he thought he was receiving. On all products, the advertised discounts were a material representation to him, and he relied on them in making his purchase decision. However, Plaintiff did not receive the benefit of his bargain and in fact paid a price premium for the items.

44.     Plaintiff has therefore suffered economic injury as a direct result of Defendant's unlawful, unfair, and fraudulent false reference pricing scheme.

**Plaintiff's Economic Injury Is Readily Quantifiable**

45.     Plaintiff has been injured and incurred quantifiable actual damages as a result of Defendant's fraudulent pricing scheme, which can be and have been preliminarily calculated through the use of regression analysis.

46.    Plaintiff overpaid for the products he purchased as described herein. And it was Defendant's false reference pricing scheme and attendant deception that caused Plaintiff to overpay. Despite Plaintiff's original beliefs that the products he purchased were discounted and thus that their value was significantly greater than the sale price for which he purchased them, Plaintiff, in actuality, paid an *inflated* price for the products he purchased.

47.    As for Plaintiff, both the "original" price of $36.00 and the sale price of $18.00 for the two Layettes Plaintiff purchased were inflated. The items he purchased were all worth less than the amount Plaintiff paid for each of them. If Defendant had not employed the falsely advertised "original" prices for these items Plaintiff purchased, then those items would not have commanded such a high, inflated price.

48.    Plaintiff was damaged in his purchases because Defendant's false reference price discounting scheme inflated the final selling price of the items he purchased, such that Defendant's false reference price discounting scheme caused Plaintiff to pay a price premium. Defendant's false reference price discounting scheme artificially inflated consumer demand, such that each consumer who purchased the corresponding product paid higher prices when compared to what they would have paid had Defendant not engaged in a false reference pricing scheme. Plaintiff would not have purchased the merchandise, or would have paid less for it, but for Defendant's representations regarding the false reference prices and purported discounts of the merchandise. Plaintiff was misled into believing that he was receiving substantial savings on the purchases of Defendant's products which was implied by the falsely advertised reference prices.

49.    In this specific case, for purposes of its investigation and determining a preliminary measure of damages, Plaintiff, with the assistance of qualified expert economists and consultants, conducted an analysis of Defendant's product SKUs and pricing practices attached to each SKU.

Plaintiff, through the use of sophisticated regression analysis, was able to determine the objective measure by which Plaintiff, and members of the proposed Class similarly situated, overpaid for the good they purchased.[32] Reference guides on utilizing regression for damages describe how "[p]ractitioners can use several tools to establish and measure relations among the variables that affect revenues and costs, and thus establish the casual link … Regression analysis applies a statistical technique to develop an equation depicting the relation among variable and then uses that equation for prediction."[33] In this case, Plaintiff's consultants utilized regression analysis to estimate the relationship between Defendant's reference prices and Defendant's selling prices, after accounting for the other factors that influence Defendant's pricing, and used that equation to predict prices that would have occurred but for misconduct in this case. As explained below, the regression analysis relies on Defendant's data and measures how selling prices increase when the intensity of their misconduct is greater (i.e. a higher reference price leads to higher selling price, holding all else equal).

50.    Plaintiff's experts used the data collected during the investigation to analyze 1,797 products offered for sale within Carter's online stores during the class period. The average selling price within this data sample was $13.92, whereas the average reference price was $26.45. Thus,

---

[32] Notably, if the "misrepresentation ... artificially inflate[s] the market price of a product, causing [Plaintiffs] to pay more for it than [they] otherwise would have—regardless of whether [they] even saw the misrepresentation," the plaintiffs were "harmed [ ] by a misrepresentation without necessarily having relied on it." *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172, at *10 (S.D.N.Y. Aug. 13, 2020). Under this "theory of causation … that the advertising and labeling practice allowed a price premium to be charged" is often known as a "market-price-based theory of causation." *Id.* at *11 (citation and internal quotation marks omitted). This theory, "unlike the promise-based theory, does not depend on the consumer's awareness of the representation." *Id.*

[33] Roman L. Weil et al., *Litigation Services handbook: the role of the Financial Expert* Ch. 4, p. 25 (6th ed. 2017).

on average, the reference price chosen by Defendant was $12.53 higher (or 90.0% higher) than the selling price.

51.    Plaintiff's experts used this data to then perform a regression model which allowed them to calculate the price premium paid by Plaintiff and all similarly situated proposed Class members for each product purchased. The regression model incorporates supply and demand factors through the use of actual selling prices, which are the net result of the competitive factors that influence Defendant's pricing. For example, the price of an item at issue in this case is a function of its component features (e.g., is the item a dress, leggings, skirt, or jeans? Is the item marketed towards women or men?). The net effect of the demand factors (e.g., consumer willingness to pay for an item based on its features) and supply factors (e.g., Defendant's production costs) are captured within the product's attributes when actual selling prices are used in this type of regression analysis.

52.    While additional variables will be accounted for after more detailed data is provided during discovery, ***this initial regression analysis already accounts for 15 variables that impact Defendant's pricing*** (including reference price). For example, the regression analysis accounts for product type (e.g., bottoms vs. tops vs. dresses vs outerwear vs accessories, etc.) and target demographic (e.g., adult vs baby vs kid vs toddler).[34] After accounting for these product characteristics, the regression finds that increasing the reference price by $1 results in an increase of approximately $0.63 in the selling price of items at Carter's.

53.    The corresponding regression equation is then used to predict selling prices if the reference price was reduced to the typical selling price of the item (i.e., lowering the reference

---

[34] An additional regression was performed that also controls for more detail product characteristics found a similar influence of reference price on selling price (e.g., accounting for long-sleeve vs short-sleeve vs sleeveless; joggers vs sweats vs shorts vs leggings, etc; active socks vs ankle socks vs crew socks vs no-show socks, etc.).

price to remove the impact of Defendant's misconduct on pricing). For example, as previously discussed, the preliminary data suggests that Defendant's reference prices were $12.53 higher (or 90.0% higher) than the selling price, on average. When combined with the preliminary regression results described above, this $12.53 differential implies that selling prices were approximately $7.89 higher, on average, due to the alleged misconduct in this case.[35] This average overcharge of $7.89 represents approximately 56.7% of the average purchase price within the data collected by Plaintiff.[36] These results will be revised upon receipt of documents and data during discovery, but the data suggests that Plaintiff and all others similarly situated paid a price premium as a result of the alleged misconduct.

54.    Plaintiff will seek in-depth discovery of documents and data to supplement this initial investigation and to show common injury at class certification and to prove damages with reasonable certainty at trial.

55.    The table below shows the application of the preliminary regression coefficient to an item purchased by Plaintiff and the resulting measure of injury.[37]

| Plaintiff | Item | Co-Efficient | Damages |
|-----------|------|--------------|---------|
| Namvary | Layettes<br>Reference Price: $36.00<br>Sale Price: $18.00 | 0.63 | $11.34[38] |

56.    The harm to Plaintiff and Class members (i.e., price premium) caused by Defendant's misconduct can also be objectively measured through the use of conjoint analysis

---

[35] That is, 0.63 x 12.53 = 7.89.

[36] 7.89 / 12.53 = 56.7%

[37] This exercise can be performed for every product Defendant has sold at a purported discount by multiplying the regression coefficient by that item's reference price/sales price differential. Once enough historical pricing and sales data is provided to Plaintiff's experts to perfect the regression coefficient, measuring the harm to each Class member will be a simple mechanical exercise.

[38] $36 – $18 = $18. $18 x 0.63 = $11.34.

supported by Defendant's historic pricing, sales, and other market data that will be obtained in discovery to isolate the price premium associated with Defendant's false referenced pricing scheme. Conjoint analysis is a well-accepted survey-based technique, whereby survey participants select their most preferred product from a series of product options with different attributes (including price).[39] The researcher will then analyze consumers' trade-offs among products with different features using a statistical model, which allows a researcher to estimate the influence of each product attribute and the willingness-to-pay ("WTP") for a particular product attribute. In other words, conjoint analysis can establish the extent to which consumer preferences (i.e., consumer demand) change due to the alleged conduct in this case and quantify the monetary impact of the alleged misconduct. After measuring the change in consumer preferences (and willingness to pay) due to the alleged misconduct in this case, an overcharge is calculated by further incorporating supply-side behavior.

57.    As with hedonic regression, Plaintiff can put forth an expert-based conjoint analysis with and/or without an economic market simulation to account for supply side factors[40] that will

---

[39] "The key characteristic of conjoint analysis is that respondents evaluate product profiles composed of multiple conjoined elements (attributes or features). Based on how respondents evaluate the combined elements (the product concepts), we deduce the preference scores that they might have assigned to individual components of the product that would have resulted in those overall evaluations" (Orme, B. "A Short History of Conjoint Analysis." Chapter 4 in *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*. Second Edition, Madison, WI: Research Publishers LLC, 2010, p. 29).

[40] An economic market simulation estimates market prices by fully incorporating the relevant supply and demand information to estimate the but-for market prices that would have been paid by consumers in the absence of the alleged misconduct. It is used to incorporate supply side factors into the but-for world in which consumers' WTP has adjusted due to the absence of the alleged misconduct. Market simulations often incorporate (and are calibrated to) real-world supply and demand market data on the defendant's (and competitor's) products, prices, costs, market share, consumer decisions (*e.g.*, mixed logit coefficients from conjoint analysis), and the price elasticity of consumer demand. Indeed, a wide body of academic literature in the economics discipline describes combining the consumer demand side of the market with the supply side of the market

likewise demonstrate the price premium attributed to products with inflated reference prices as compared to those without inflated reference prices. This approach will isolate the economic harm to Class members due solely to Defendant's misconduct and will demonstrate that otherwise identical products sold *without* reference prices ultimately cost less.

58.    Accordingly, objective measures demonstrate that Plaintiff overpaid for the Carter's merchandise he purchased. The difference between the sale price paid by Plaintiff due to the artificially increased demand for the products—caused by Defendant's false reference pricing scheme—and the market sale price that the products would have commanded without Defendant's misconduct provides an objective measure by which Plaintiff was overcharged and injured by Defendant. The amount of inflation of the prices for the Carter's merchandise Plaintiff purchased caused by Defendant's deception thus measures how much Plaintiff overpaid. As shown forth above, this amount can be quantified using regression analysis based on Defendant's historic pricing data. Plaintiff's allegations therefore sufficiently allege a "connection between the misrepresentation and any harm from, or failure of, the product." *Small v. Lorillard Tobacco*

---

to determine market equilibrium prices. For example, Steven Berry, et al., Automobile Prices in Market Equilibrium, 63 *Econometrica* 841 (1995); Aviv Nevo, A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand, 9 *Journal of Economic and Management Strategy* 513-548 (2000); Steven Berry, et al., Differentiated Products Demand Systems from a Combination of Micro and Macro Data: The New Car Market, 112 *Journal of Political Economy* 68-105 (2004); Petrin, Amil, Quantifying the Benefits of New Products: The Case of the Minivan, 110 *Journal of Political Economy* 705–729 (2002); Greg Allenby, et al., Valuation of Patented Product Features, 57 *The Journal of Law & Economics* 629-663 (2014). Within the context of consumer class action litigation, various courts have accepted damages models based on economic market simulations that incorporate the findings of a conjoint analysis with additional supply-side factors. *See, e.g., Wesley Won et al. v. General Motors*, *LLC*, No. 2:19-cv-11044 (DML) (DRG) (U.S. District Court: Michigan Eastern, July 28, 2022); *Thomas Allegra et al. v. Luxottica Retail North America*, d/b/a Lenscrafters, Case No. 17 CV-5216 (PKC) (RLM) (U.S. District Court: New York Eastern, December 13, 2021); *Riley Johannessohn, et al. v. Polaris Industries*, Inc., Case No. 16-cv-03348 (NEB/LIB) (U.S. District Court: Minnesota, March 31, 2020) ("There is no question that a market simulation is a scientifically valid method to determine the market equilibrium price in a counterfactual world").

*Co., Inc.*, 94 N.Y.2d 43, 56 (1999). *See also Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (requiring allegations that, "on account of a materially misleading practice, [plaintiff] purchased a product and did not receive the value of her purchase") (emphasis added).

## Plaintiff Has Standing For Injunctive Relief and Lacks An Adequate Remedy at Law

59.    Plaintiff does not have an adequate remedy at law, and is susceptible to recurring harm because he likes the style and brand of products at Defendant's stores, he has purchased many items form Defendant in the past, and he wants to purchase new and additional items from Defendant in the future. Indeed, Plaintiff has shopped at Carter's on numerous occasions in the past, and Carter's sells a wide variety of popular children's merchandise of the type that Plaintiff will need and would like to continue to purchase in the future either for his own family, or as gifts for friends and/or other family members. However, due to the large variety of styles and sizes of merchandise offered, Plaintiff will be unable to parse what prices are inflated and untrue, and what, if any, prices are not, and he may again, by mistake, purchase falsely discounted products from Defendant in the future based on the reasonable, but false, impression that the advertised ticket price(s) are *bona fide*. In short, Plaintiff will have no reasonable means to determine in the future whether Carter's is continuing to advertise false ticket prices and discounts, or whether it has stopped doing so, and he is therefore susceptible to future deception and recurring harm in the immediate future.

60.    Absent an equitable injunction enjoining Defendant from continuing in the unlawful course of conduct alleged herein, Plaintiff, members of the Class, and the general public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendant's ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiff, members of the Class,

and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee them the appropriate assurances.

**Defendant**

61.    Plaintiff is informed and believes, and upon such information and belief alleges, Defendant Carter's is a Delaware corporation with its principal executive offices in Atlanta, Georgia. It is therefore a dual citizen of Delaware and Georgia. Defendant owns and operates Carter's stores in New York, and throughout the United States, where it advertises, markets, distributes, and/or sells clothing and accessories for infants and young children.

62.    According to its latest Form 10-K filed with the Securities and Exchange Commission, Carters is the "largest branded marketer of young children's apparel in North America," and it owns "two of the most highly recognized and trusted brand names in the children's apparel market, *Carter's* and *OshKosh B'gosh*." Based on information and belief, including a review of Carter's public filings with the Securities and Exchange Commission, Plaintiff alleges that Carter's does not sell any non-exclusive, or national-branded products. Accordingly, its entire product line consists of its own private-branded products.

63.    Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sues such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is, in some manner, legally responsible for the harm suffered by Plaintiff and members of the proposed Class as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

64.    Defendant fraudulently concealed from and intentionally failed to disclose to Plaintiff and other members of the proposed Class the truth about its advertised discount prices

and former reference prices. Defendant concealed from consumers the true nature and value, and quality of the products sold at their Carter's stores and on the Carter's website.

65.     Defendant intentionally concealed and failed to disclose material facts regarding the truth about its false former price advertising in order to provoke Plaintiff and the proposed Class to purchase Carter's products in its stores and on its website.

66.     At all relevant times, Defendant has been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

## V.     CLASS ALLEGATIONS

67.     Plaintiff brings this action on behalf of himself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant:

> All persons who, while within the State of New York and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from Carter's (in-person or online) one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more sub-classes, in connection with his motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

68.     ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been harmed by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

69.    ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.    whether, during the Class Period, Defendant used falsely advertised reference prices on its product labels and falsely advertised price discounts on merchandise sold in its stores and on its website;

b.    whether Defendant ever offered items for sale or sold items at their advertised reference price;

c.    whether, during the Class Period, the original price advertised by Defendant was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

d.    whether Defendant's advertised sale prices reflect any actual discounts or savings;

e.    whether Defendant's purported percentage-off discounts reflect any actual discounts or savings;

f.    whether Defendant's alleged conduct constitutes violations of the laws asserted;

g.    whether Defendant engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

h.    whether Plaintiff and Class members are entitled to restitution and/or damages, and the proper measure of restitution and/or damages; and

i.      whether an injunction is necessary to prevent Defendant from continuing to use false, misleading or illegal price comparison.

70.      **Typicality**: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all Class members.

71.      **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Class.

72.      **Superiority**: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

73.      All Class members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendant's consistent false sale prices,

advertising scheme, disseminated in a years-long campaign to California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's false advertising scheme when purchasing merchandise sold by Carter's.

74.    Plaintiff is informed that Defendant keeps extensive computerized records of its customers through, *inter alia*, customer loyalty programs, credit card programs, and general marketing programs. Defendant has one or more databases through which a significant majority of Class members may be identified and ascertained, and it maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the New York Consumer Protection From Deceptive Acts and Practices Act ("NYDAPA")**
**N.Y. GBL § 349, *et seq.***

75.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

76.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the New York Deceptive Acts and Practices Act ("NYDAPA"), N.Y. GEN. BUS. LAW § 349.

77.    NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349. Defendant's conduct, as set forth herein, constitutes deceptive acts or practices under this section.

78.    Plaintiff and members of the proposed Class are "persons" under NYDAPA, N.Y. GEN. BUS. LAW § 349(h), and Defendant's actions as set forth herein occurred in the conduct of "business, trade or commerce" under NYDAPA.

79.    In the course of its business, Defendant advertised false reference prices that gave consumers, including Plaintiff and members of the proposed Class, the impression that its products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendant's retail stores were worth more than they actually were.

80.    Plaintiff and members of the proposed Class had no way of discerning that Defendant's representations were false and misleading.

81.    Defendant thus violated and continues to violate NYDAPA by making statements that, when considered as a whole from the perspective of a reasonable consumer, give the false impression that the products sold at Defendant's retail stores are worth more than they actually are.

82.    Defendant knew or should have known that its conduct violated NYDAPA and owed a duty to Plaintiff and members of the proposed Class to refrain from engaging in deceptive acts or practices, and to disclose the truth about its false discounts.

83.    Defendant intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding the prices of its apparel and retail products with intent to mislead Plaintiff and members of the proposed Class.

84.    Defendant's misleading and false advertisements were material to Plaintiff and members of the proposed Class, as they relate to the price of the product the consumer is receiving

and paying for. A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the product.

85.    Defendant's unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiff and members of the proposed Class, about the price of its apparel and other retail products. Plaintiff and members of the proposed Class reasonably relied upon Defendant's artificially inflated reference prices and false discounts when purchasing the apparel and retail products from Defendant's retail stores. Plaintiff and members of the proposed Class would not have made such purchases but for Defendant's representations regarding the substantial discount being offered for the products.

86.    Defendant's violation of NYDAPA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff, members of the proposed Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and led to financial damage for consumers like Plaintiff and members of the proposed Class.

87.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's businesses, Plaintiff and members of the proposed Class suffered ascertainable loss and actual damages.

88.    Plaintiff and members of the proposed Class are entitled to all of the damages, remedies, fees, and costs available under NYDAPA, including, but not limited to, injunctive relief, recovery of actual damages and/or fifty dollars in statutory damages, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## SECOND CAUSE OF ACTION
### Violation of the New York False Advertising Law ("NYFAA")
### N.Y. GBL § 350, *et seq.*

89.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

90.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the New York False Advertising Act ("NYFAA"), N.Y. GEN. BUS. LAW § 350.

91.    The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity . . ." N.Y. GEN. BUS. LAW § 350(a).

92.    Defendant's routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendant's actual sale price), constitutes an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendant's retail stores were worth more than they actually were.

93.    Defendant intentionally and knowingly misled consumers by making untrue and misleading statements and failing to disclose material facts regarding the prices of their apparel and retail products with intent to mislead Plaintiff and members of the proposed Class.

94.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and members of the proposed Class, about the

price of its apparel and retail products. Plaintiff and members of the proposed Class reasonably relied upon Defendant's artificially inflated reference prices and false discounts when purchasing the apparel and retail products from Defendant's retail stores. Plaintiff and members of the proposed Class would not have made such purchases but for Defendant's representations regarding the substantial discount being offered for the product.

95.     Defendant's violation of the NYFAA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff, members of the proposed Class, and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and led to financial damage for consumers like Plaintiff and members of the proposed Class.

96.     As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's businesses, Plaintiff and members of the proposed Class suffered ascertainable loss and actual damages.

97.     Plaintiff and members of the proposed Class are entitled to all of the damages, remedies, fees, and costs available under NYFAA, including, but not limited to, injunctive relief, recovery of actual damages and/or five hundred dollars per violation, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

### VII.     PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of himself and on behalf of the other members of the Class, requests that this Court award relief against Defendant as follows:

a.      an order certifying the Class and designating Plaintiff as the Class Representative and his counsel as Class Counsel;

b.      awarding actual, punitive and statutory damages as permitted under the New York False Advertising Act and the New York Consumer Protection from Deceptive Acts and Practices Act;

c.      awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

d.      awarding declaratory and injunctive relief as permitted by law or equity, including an order enjoining Defendant from continuing the unlawful practices as set forth herein and retaining jurisdiction to monitor Defendant's compliance with permanent injunctive relief;

e.      ordering Defendant to engage in a corrective advertising campaign;

f.      awarding attorneys' fees and costs; and

g.      for such other and further relief as the Court may deem necessary or appropriate.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: September 6, 2024

**LYNCH CARPENTER LLP**

By:   */s/ Gary F. Lynch*
Gary F. Lynch (NY 5553854)
gary@lcllp.com
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone:   (412)   322.9243

Todd D. Carpenter (*pro hac vice* forthcoming)
todd@lcllp.com
Scott G. Braden (*pro hac vice* forthcoming)
scott@lcllp.com
James B. Drimmer (*pro hac vice* forthcoming)
jim@lcllp.com
Matthew J. Zevin (*pro hac vice* forthcoming)
mattz@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:      (619) 762-1900
Facsimile:      (858) 313-1850

*Attorneys for Plaintiff and
Proposed Class Counsel*